# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

ESTATE OF SEYMOUR KRINSKY,
By Its Personal Representative, Sharon Brown,

    Plaintiff,

v.

THE GIII ACCUMULATION TRUST,
SEYMOUR KRINSKY INSURANCE TRUST,
and MLF LEXSERV LP,

    Defendants.

C.A. No.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Estate of Seymour Krinsky, by Its Personal Representative Sharon Brown, (the "Estate"), files and asserts this Complaint against Defendants, The GIII Accumulation Trust ("GIII"), Seymour Krinsky Insurance Trust ("Insurance Trust"), and MLF LexServ LP ("MLF"), and in support thereof, alleges and says:

## INTRODUCTION

1. This action arises from a well-orchestrated stranger-originated life insurance ("STOLI") scheme operated in and through the State of Delaware by one of the world's largest and most sophisticated investors. This STOLI scheme operated for a period of years in the mid-2000s and likely generated billions of dollars of fraudulent STOLI policies, all for the purpose of wagering on the lives of senior citizens.

2. This action focuses on a particular STOLI policy that was manufactured on the life of Florida resident Seymour Krinsky, who was induced to lend his life to investors who created a $7 million life insurance policy (the "Policy") to illegally wager on Mr. Krinsky's life, in violation of Delaware's Constitution and public policy against human life wagering.

3. This illegal scheme was carried out over a period of years, and ultimately came to fruition for Defendants when some or all of them collected a $7 million death benefit from the Policy when Mr. Krinsky passed away in June 2020.

4. The Estate brings this case under Delaware's common law and Delaware's Insurance Code, 18 *Del. C.* § 2704, to recover the illegal STOLI proceeds paid out on the Policy and to prevent Defendants from reaping any benefit from their illegal scheme.

## PARTIES

5. The Estate was established pursuant to Florida law following the death of Seymour Krinsky, who at all times relevant to this complaint was a citizen of Florida. The Personal Representative of the Estate is Mr. Seymour's daughter, Sharon Brown, a citizen of Florida. The Estate is a citizen of Florida.

6. GIII is a Delaware statutory trust formed pursuant to the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, *et seq.*, with its principal place of business in Wilmington, Delaware. As a Delaware statutory trust, GIII is a separate legal entity under 12 Del. C. § 3801(g) and can be sued in its own name. The trustee of GIII is a Delaware limited trust company with a principal place of business in Wilmington, Delaware. GIII is wholly owned by DBAH Capital, LLC ("DBAH"). DBAH stands for "Deutsche Bank America Holdings Corp.," and according the Deutsche Bank AG's public financial disclosures, DBAH is operated by certain members of Deutsche Bank's senior management team.

7. The Seymour Krinsky Insurance Trust ("Insurance Trust") was established as a Delaware statutory trust with a Delaware trustee located in Wilmington, Delaware.

8. MLF is a limited liability company organized under Delaware law with its principal place of business in Bethesda, Maryland.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff, a citizen of Florida, and the Defendants, citizens of Delaware and Maryland.

10. This Court has specific personal jurisdiction with respect to Defendants GIII and the Insurance Trust because both entities hold, or at one time held, the beneficial interest in a life insurance policy issued on the life of an insured residing in Boca Raton, Florida. Defendant GIII or its agents actively targeted elderly individuals living in Florida, including Mr. Krinsky, as instrumentalities upon whose lives they could illegally wager. Defendant GIII or its agents, including MLF, monitored Mr. Krinsky's health, including by contacting Mr. Krinsky's family in Florida. Upon information and belief, after his passing, Defendants GIII and the Insurance Trust or their agents, including MLF, requested and obtained a copy of Mr. Krinsky's death certificate from the Florida Department of Health and used that death certificate to make a claim for the death benefit on a life insurance policy issued on the life of a Florida resident, Mr. Krinsky.

11. This Court has specific personal jurisdiction with respect to MLF because, among other things, MLF, acting on its own behalf or as an agent for its principals, has had extensive personal contact with Florida, including action within Florida to monitor, service, maintain, and collect or assist in collecting on a life insurance policy issued on the life of Mr. Krinsky, a Florida resident. These activities of MLF, acting on its own behalf or as an agent of its principals, included contacting Mr. Krinsky's family within Florida to monitor Mr. Krinsky's health. Upon information and belief, after his passing, MLF, on its own behalf or as an agent of its principals, requested and obtained a copy of Mr. Krinsky's death certificate from the Florida

Department of Health and used that death certificate to make a claim for the death benefit of a policy issued on Mr. Krinsky's life.

12. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Estate's claims occurred in the Southern District of Florida.

### FACTS COMMON TO ALL CLAIMS

13. As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id.*

14. Although speculators have been around for hundreds of years, never has the problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

15. It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price*

*Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id*.

16. On information and belief, one such STOLI investor was Deutsche Bank, a German multinational investment bank and financial services company headquartered in Frankfurt, Germany.

17. While there are a variety of STOLI schemes that were orchestrated by various investors in the mid-2000s, Deutsche Bank's STOLI scheme was based on what is known in the STOLI industry as a beneficial interest transfer deal. Under this type of STOLI scheme, life insurance policies are procured through sham trusts using form trust agreements. To conceal from the insurance company the fact that the policy is STOLI, the policy itself generally remains in the name of the sham trust. Meanwhile, the beneficial interest in that sham trust is transferred behind the scenes to an investor, who then effectively owns the policy.

18. In Delaware and other places, these STOLI transactions violate constitutional bans on wagering and insurable interest laws and they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual protection to an insured's family or others with an insurable interest—into a cash machine whereby strangers to the insured are actually more interested in seeing the insured dead than alive.

19. On information and belief, to operate its beneficial interest STOLI scheme, Deutsche Bank created numerous Delaware statutory trusts in the early to mid-2000s, each operating out of Wilmington, Delaware, as a so-called "Accumulation Trust."

20. Deutsche Bank's Accumulation Trusts include "The GIII Accumulation Trust," which was the Deutsche Bank Accumulation Trust specifically at issue in *Price Dawe*, as well as over a dozen other similar trusts, with names including: "The Life Accumulation Trust;" "The

Life Accumulation Trust II" and so on through and including "Life Accumulation Trust XI;" "The CAP Accumulation Trust;" "The GPR Accumulation Trust;" "The PEB Accumulation Trust;" and "The SLA Accumulation Trust."

21. On information and belief, the beneficial owner of these Accumulation Trusts was DBAH, a Delaware limited liability company with its principal place of business in Wilmington, Delaware and a wholly-owned entity of Deutsche Bank AG. According to Deutsche Bank's public financial disclosures, DBAH stands for "Deutsche Bank America Holdings Corp." and DBAH is operated by certain members of Deutsche Bank's senior management team.

22. Deutsche Bank's Accumulation Trusts were, on information and belief, nothing more than shell entities used by Deutsche Bank to manufacture and procure STOLI policies that were either kept by Deutsche Bank or its affiliates, or resold to other STOLI investors.

23. On information and belief, Deutsche Bank was assisted in its efforts by other STOLI promoters who acted as Deutsche Bank's agents, including, on information and belief: (i) Park Venture Advisors, LLC ("Park Venture"), a Delaware limited liability company with a registered agent in Wilmington, Delaware; (ii) Louis Kreisberg and Grant Heller, individuals who are believed to have owned and/or directed Park Venture at the relevant time; and (iii) Joseph Capital, LLC ("Joseph Capital"), a Delaware limited liability company with a registered agent in Wilmington, Delaware which advertises itself as an investment bank headquartered in New York, New York, and claims to be run by a management team comprised of bankers from Deutsche Bank and other global financial institutions (collectively, "Deutsche Bank's Agents").

24. On information and belief, Deutsche Bank's Accumulation Trust STOLI scheme operated as follows:

- Deutsche Bank, through Deutsche Bank's Agents, established a nationwide network of rogue insurance producers, who assisted them by, among other things, identifying

- senior citizens meeting their investment criteria and causing those seniors to become involved in the STOLI transactions they were orchestrating.

- Deutsche Bank, through Deutsche Bank's Agents, would have senior citizens like Mr. Krinsky sign boilerplate trust documents to create Delaware statutory trusts in the seniors' names.

- Contrary to the insurable interest requirement set forth by the Delaware Constitution, the Delaware Insurance Code, and the Delaware Supreme Court in *Price Dawe*, these Delaware statutory trusts were minimally funded and were created so that Deutsche Bank could use these trusts to apply for, purchase, hold and/or transfer large life insurance policies on the lives of senior citizens.

- Prior to, or shortly after, issuance of a policy, Deutsche Bank, through its Accumulation Trusts, received the sole beneficial interest in each Delaware statutory trust it created, and thus the interest in every policy owned by such trusts.

- To induce senior citizens like Mr. Krinsky to permit Deutsche Bank to carry out its STOLI program, Deutsche Bank, through Deutsche Bank's Agents and its Accumulation Trusts, paid, or promised to pay, the insureds financial compensation, in exchange for which Deutsche Bank, through the Accumulation Trusts, became the beneficial owner of the trusts used to create the policies.

- Deutsche Bank, and not the insureds like Mr. Krinsky, paid all of the premiums necessary to procure the policies that were owned by such trusts.

25. Thus, on information and belief, Deutsche Bank operated an illegal STOLI scheme that created life insurance policies lacking insurable interest and that were nothing more than mere wagers, including on the life of Mr. Krinsky who, at the time the Policy was procured, was in his late 70's and living in Boca Raton, Florida.

26. Upon information and belief, in or around 2006, Deutsche Bank, by way of its agents, used Mr. Krinsky to procure the Policy—not for Mr. Krinsky or his family or for a legitimate insurance purpose—but rather for Deutsche Bank's own financial purposes.

27. On information and belief, consistent with Deutsche Bank's STOLI program, Mr. Krinsky signed a series of non-negotiable, boilerplate documents, including trust agreements used to create the Insurance Trust as a Delaware statutory trust with a Delaware trustee.

28. The Insurance Trust was a sham, however, because on information and belief it was minimally funded and created as a means to conceal the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Insurance Trust lacked any valid insurable interest in Mr. Krinsky's life.

29. Nonetheless, using this sham trust arrangement, Deutsche Bank—acting through Deutsche Bank's Agents and Accumulation Trusts—caused the Policy to be applied for, issued, and delivered in Delaware to the Delaware trustee of the Insurance Trust.

30. On information and belief, consistent with Deutsche Bank's Accumulation Trust STOLI scheme, the beneficial interest in the Insurance Trust was transferred to one of Deutsche Bank's Accumulation Trusts so that the Policy was effectively owned and controlled by Deutsche Bank itself.

31. On June 20, 2021, Mr. Krinsky passed away.

32. Upon information and belief, MLF (which advertises on its website that it has collected "$4B in death benefit[s]"), acting for itself or on behalf of its principals (including GIII and the Insurance Trust) subsequently made a claim for the Policy's $7 million death benefit, after which the death benefit was paid by the issuing insurance company to MLF and/or its principals (GIII and the Insurance Trust), after which the death benefit eventually was credited to Deutsche Bank itself, as intended from the start.

### FIRST CAUSE OF ACTION:  RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

33. The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

34. The Policy is controlled by and subject to Delaware law. Indeed, among other things, the Policy was intentionally created under Delaware law including because it was issued and delivered to the Delaware trustee of the Insurance Trust in Wilmington, Delaware. Accordingly, the Policy was created as a Delaware trust-owned policy and "shall be controlled" by Delaware's Insurance Code, without regard to the fact that Mr. Krinsky was a resident of Florida. 18 *Del. C.* § 2704(g).

35. The Delaware Insurance Code provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured." 18 *Del. C.* § 2704.

36. The Delaware Supreme Court has confirmed that this insurable interest requirement is not satisfied where a third party without insurable interest uses an insured as an instrumentality to procure a policy for itself as a wager on the insured's life. *See generally*, *Price Dawe,* 28 A.3d 1059 (Del. 2011). Indeed, the STOLI program that was the subject of the Delaware Supreme Court's seminal anti-STOLI decision in *Price Dawe* was *the same Deutsche Bank STOLI scheme as in the present case. See id.*

37. Further, in Delaware, as in the majority of states, where an insurance company pays the death benefit on a policy lacking insurable interest, the estate of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee as a matter of common law and statute, 18 *Del. C.* § 2704(b). Indeed, in a recent decision affirming the anti-STOLI principles it articulated in *Price Dawe*, the Delaware Supreme Court expressly confirmed that "§ 2704(b) directs that if a death benefit is paid under an insurance policy that lacks an insurable interest, the

estate of the insured may recover the death benefit from the recipient." *See Lavastone Capital v. Estate of Beverly E. Borland,* __ A.3d __ (2021) ("*Berland*"). In *Berland*, the Delaware Supreme Court further explained that investors such as Defendants in the present case cannot rely on allegations of fraud by the insured in question (unless those investors can show they are the actual fraud victims which is unlikely) and that investors such as Defendants in the present case cannot rely on allegations that the insured in question acted with unclean hands or was somehow *in pari delicto* because such "equitable principles do not apply" in these cases.

38. As set forth above, the Policy at issue in this case was clearly procured without insurable interest as a wager on Mr. Krinsky's life.

39. Moreover, the death benefit on the Policy was paid, transferred, or otherwise assigned to Defendants.

40. As a consequence, the Estate is entitled to recover the death benefit (plus applicable interest, attorneys' fees, and other costs and damages) from whichever Defendant received those proceeds, either by check or wire or by way of any other transfer.

41. Moreover, even if MLF never received the death benefit, the Estate is entitled to a judgment against MLF for an amount equal to the death benefit on a theory of vicarious liability. As alleged above, MLF monitored, serviced, and maintained the Policy, and collected or assisted in collecting the death benefit of the Policy while acting as an actual and/or apparent agent, representative, or contractor of GIII and the Insurance Trust. These acts were, upon information and belief, committed within the scope of MLF's actual and/or apparent agency while performing services for GIII and the Insurance Trust and/or furthering their business interests.

WHEREFORE, the Estate demands judgment against the Defendants in her favor for the entire death benefit paid, as well as interest, attorneys' fees, costs, and damages, and such other relief as deemed appropriate by the Court.

Dated: January 11, 2022

COZEN O'CONNOR P.C.

*/s/ Ashley Gomez-Rodon*
Ashley Gomez-Rodon
Florida Bar No.: 1010237
Southeast Financial Center
200 South Biscayne Blvd., Ste. 3000
Miami, FL  33131
Phone:  7868713996
Fax:  7862205942

-and-

Michael J. Miller (*pro hac vice* forthcoming)
Gregory J. Star (*pro hac vice* forthcoming)
Alex H. Hayden (*pro hac vice* forthcoming)
One Liberty Plaza
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone:  (215) 665-2000
Facsimile:  (215) 372-2349

*Attorneys for Plaintiff*